IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 12-cv-03341-LTB-MJW

EUGENE FOSTER, and
ROBERT FISK,

      Plaintiffs,

v.

MOUNTAIN COAL COMPANY, L.L.C.,
ARCH WESTERN RESOURCES, L.L.C., and
ARCH COAL, INC.,

      Defendants.

_____

ORDER
_____

      This matter comes before me on Defendants' Motion for Summary Judgment (Robert

Fisk) (Doc. # 45) to dismiss Plaintiff Robert Fisk's claims for age and disability discrimination

under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et. seq*., the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq*., and the Colorado Anti-

Discrimination Act, C.R.S. § 24-34-401, *et. seq*.  Plaintiff Fisk, a former Mountain Coal

employee, filed a Complaint on December 26, 2012 alleging various claims under the ADA,

ADEA and Colorado law.  [Doc. # 1].  Plaintiff Fisk signed a severance agreement under which

he agreed to release Defendants from liability for any claims he had against the company in

return for severance payment and other benefits.  Defendants contend that Plaintiff Fisk waived

his claims by signing the release and severance agreement at the time of his termination.

Plaintiff Fisk alleges that the release is invalid because neither the severance agreement itself, nor the documents provided with it comply with the Older Workers' Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1), and that his waiver was not otherwise "knowing and voluntary." For the reasons set forth below, I deny Defendants' motion.

## I. FACTS

The enforceability of Plaintiff Fisk's Severance Agreement is a threshold issue that should be resolved before full discovery into Plaintiff Fisk's age and disability discrimination claims commence. The Parties conducted limited discovery regarding Plaintiff Fisk's Severance Agreement. Defendants then filed a motion for summary judgment regarding the enforceability of the Severance Agreement's waiver provision. Thus, this order is limited to addressing the validity the Severance Agreement's waiver provision.

Plaintiff Fisk has a high school education, has not taken any college courses, attended trade school for heating and air conditioning repair and maintenance ("HVAC"), but did not receive a degree or diploma. [Doc. # 52, 4]. His work background is in construction and mining, and he has worked in mining for the past 20 years. [*Id.* at 5]. He worked as an underground miner for Defendant Mountain Coal Company of Colorado, L.L.C. at the West Elk Mine from May 2001 through June 2009. [*See* Doc. # 45, 2].

In June 2009, he and "approximately sixty other employees were laid off as part of a reduction-in-force ("RIF") at the mine." [*Id.*] Plaintiff Fisk purportedly learned of his layoff during a June 17, 2009 meeting, at which he and the other terminated employees were presented with a Severance Agreement and Release of All Claims (the "Agreement"). [*Id.*] The

2

Agreement released Defendants from "any and all claims arising from [Plaintiff] Fisk's employment in exchange for an $8,800 severance payment and other consideration." [*Id.*] Plaintiff Fisk signed the Agreement on July 5, 2009. [*Id.*] The relevant sections of the Agreement provide:

2.     Employee's employment will end effective June 17, 2009. Within the time required by law, Employer will pay Employee an amount equal to Employee's accrued wages plus all earned and unused vacation, less applicable taxes, withholdings and standard deductions. Within **45 days** after Employee signs this Agreement, Employer also will pay Employee severance pay in the amount of $8,800, less applicable taxes, withholdings and standard deductions as well as any prior pay advances.

. . .

4.     Employee hereby releases Employer from all claims, demands or other rights to sue, whether they are known or unknown, foreseen or unforeseen, arising at any time before the date of this Agreement, including but not limited to those that arise from or relate to any aspect of Employee's employment with Employer, Employee's termination from employment or any employment custom, practice, policy, conduct or decision of Employer relating to any term or condition of Employee's employment, including but not limited to:

(1) any claims or rights that could be asserted under:

(a)     the Age Discrimination in Employment Act as amended, 29 U.S.C. § 621 et seq. **In accordance with such law, employee is provided in Exhibit A: 1) a written list of the job titles and ages of all individuals eligible or selected for the same reduction in force; 2) an identification of the job classification or organizational unit targeted for that reduction in force; 3) the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the reduction in force; and 4) the factors used to determine who is subject to the reduction in force.**;

(b)     any applicable state law prohibiting or otherwise relating to employment discrimination, including but not limited to the Colorado civil rights laws and any statutory or common law giving rise to a cause of action for retaliation for filing a worker's compensation claim or otherwise

3

engaging in protected conduct;

( c )   the common law of the state of Colorado;

. . .

(i)   the Americans with Disabilities Act, 42 U.S.C. § 12101

. . .

5.   Employee covenants and warrants that Employee will not sue or cause any complaint or lawsuit of any sort to be brought or join in or allow any complaint or lawsuit by any third party against Employer based in whole or in part on claims released in this Agreement.  Employee further agrees that, if any person or entity should bring such a complaint or law suit on Employee's behalf, Employee hereby waives and gives up any right to recover under such claim and will exercise every good faith effort to have that claim dismissed.  Despite the foregoing or anything to the contrary in this Agreement, Employee is not releasing Employee's right to file a Charge with or participate in an investigation by the Equal Employment Opportunity Commission, the Department of Labor or other state or federal agency, subject to the legal requirements for doing so.  However, Employee waives and gives up any right to damages that may be awarded on the basis of such Charge and also waives and gives up any subsequent right to sue based on such Charge.

**6.   Because this agreement contains a release of claims under the Age Discrimination in Employment Act, Employee shall have 45 days from the day Employee receives it to consider it.  Employee may accept the offer contained in this agreement at any time within that 45-day period by signing it and delivering it to Employer.  If Employee does not accept this offer by signing this Agreement before the end of 45-day period, it shall be automatically revoked (meaning Employee will not have the right to a severance payment or to health coverage at active employee rates).  If Employee does accept the offer, Employee shall have seven (7) days after delivery of the signed agreement to Employer to revoke (i.e. cancel) Employee's acceptance.  The severance payment referenced above shall commence only after the seven (7) day revocation period expires, within the time limits previously indicated.**

. . .

10.   Employee will keep, and cause his/her attorneys and agents to keep, the terms of this Severance Agreement and Release strictly confidential and will not directly or indirectly disclose the terms to anyone (either verbally or in writing) except (a) that Employee may discuss this Agreement with his/her attorney or accountant on a confidential basis to the extent necessary to prepare

4

Employee's tax returns or interpret the Agreement; (b) to the extent that Employee is compelled by a court or governmental authority to reveal the Agreement, provided, however, that Employee will immediately advise Employer of this fact; or (c) in a suit to enforce or for breach of this Agreement, provided that the Agreement is kept under seal by the Court pursuant to a protective order.

. . .

16.     Employee acknowledges that Employee has been given a reasonable period of time within which to consider the terms of this Severance Agreement and Release.

17.     Employee acknowledges that Employee has carefully read this Agreement, understands all its terms, and has signed it voluntarily with full knowledge of its significance after opportunity for consideration and consultation with Employee's attorney, family and/or advisors before signing this Agreement. Employee represents that no payments or other things of value have been promised to Employee for signing and delivering this Agreement other than the payments, agreements and benefits described herein, which payments, benefits and agreements constitute adequate payment for the claims herein released and Employee's other agreements outlined in this Agreement and that no attorney or counsel is entitled to any fees from Employer as a result of this Agreement.

Doc. # 45, ex. 2 (emphasis in original).  In addition to severance payments, the Agreement states that Plaintiff Fisk would continue to receive health insurance for three months at employee rates.

[*Id.*]  Additional facts, related in the light most favorable to Plaintiff Fisk, the party against whom summary judgment is sought, will be provided as they relate to specific arguments and issues raised in the Parties' papers.

## II.  STANDARD OF REVIEW

Fed. R. Civ. P. 56(a) allows a party to "move for summary judgment, identifying each claim or defense – on which summary judgment is sought."  Summary judgment "is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (*quoting* Fed. R. Civ. P. 56(a)).  The mere existence of some factual dispute does not

defeat a summary judgment motion, however there must be a genuine issue of material fact for the case to survive. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (*citing Anderson*, 477 U.S. at 248)). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (*citing Anderson*, 477 U.S. at 248). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). A defendant may present an affirmative defense in a summary judgment motion which entitles it to a judgment as a matter of law. *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). A defendant making such a motion, however, must demonstrate that no disputed material fact exists regarding the affirmative defense asserted. *Id.*; *Madrid v. Phelps Dodge Corp*., 211 F. App'x 676, 681 (10th Cir. 2006).

Under this standard, the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Bryant v. Farmers Ins. Exch*., 432 F.3d 1114, 1124 (10th Cir. 2005). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party who "may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. DISCUSSION

In 1990, Congress enacted the OWBPA, 29 U.S.C. § 626(f), which amended the ADEA by limiting the manner in which an employee may waive the protections afforded under the ADEA, and by mandating that any waiver of ADEA claims satisfy certain minimum requirements.  In essence, when an employee signs a purported release of claims arising under the ADEA, that release will not bar an ADEA claim unless the release complies strictly with the statutory requirements of the OWBPA.  The first issue presented by Defendants' motion for summary judgment is whether the releases signed by Plaintiff Fisk complied with the requirements of the OWBPA.

Additionally, the Tenth Circuit has held that the statutory factors of the OWBPA are not exclusive and other circumstances, in addition to the express statutory requirements, may impact whether a waiver under the OWBPA is knowing and voluntary.  *See Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1228 (10th Cir. 1999).  Under the "totality of the circumstances" approach, the Tenth Circuit requires district courts to look "beyond the contract language and consider all relevant factors in assessing a plaintiff's knowledge and the voluntariness of the waiver."  *See id.* (*quoting Torrez v. Public Serv. Co. of N.M., Inc.*, 908 F.2d 687, 689 (10th Cir. 1990)).  Thus, even assuming a release satisfies the statutory minimum requirements, I must nonetheless consider whether any "non-statutory circumstances such as fraud, duress, or mutual mistake may render an ADEA waiver not 'knowing and voluntary' under the OWBPA."  *See id.* at 1229. The second issue, then, presented by Defendants' motion is whether Plaintiff Fisk's release was knowing and voluntary under the totality of the circumstances.  Lastly, I address whether Plaintiff Fisk also released his state discrimination claims.

**A.      Whether the Release Complied with the Older Worker Benefits Protection Act**

I first address whether the release in the Agreement strictly complies with the requirements of the OWBPA.  The OWBPA, 29 U.S.C. § 629(f), "is designed to protect the rights and benefits of older workers."  *Oubre v. Energy Ops., Inc.*, 522 U.S. 422, 427 (1998). "When a worker within the class protected by the age discrimination law (age 40 and up) leaves his employment, it is common for the employer to try to obtain a waiver of the worker's right to bring a suit under that law." *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 669 (7th Cir. 1998). In order for such a waiver to be valid, the OWBPA requires the employer to provide the employee with certain information so that he or she can assess, with the assistance of counsel, the viability of such a discrimination claim. *Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1259 (6th Cir. 1997).

The OWBPA prohibits the waiver of ADEA claims if the waiver is not "knowing and voluntary."  29 U.S.C. § 626(f)(1).  The statute provides that an ADEA waiver is not knowing and voluntary unless, "at a minimum," it complies with the requirements set out in the statute. *Id.*  To be considered knowing and voluntary the waiver must comport with the following minimal requirements:

   (A)     the waiver is part of an agreement between the individual and the
           employer that is written in a manner calculated to be understood by such
           individual, or by the average individual eligible to participate;

   (B)     the waiver specifically refers to rights or claims arising under this chapter;

   (C)     the individual does not waive rights or claims that may arise after the date
           the waiver is executed;

   (D)      the individual waives rights or claims only in exchange for consideration
           in addition to anything of value to which the individual already is entitled;

8

(E)     the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)     (i) the individual is given a period of at least 21 days within which to consider the agreement; or

(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G)     the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H)     if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to-

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).  The OWBPA also mandates that the release not affect the EEOC's rights and responsibilities to enforce the ADEA.  *See id.* at § 626(f)(4) ("No waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Commission").  The OWBPA explicitly places the burden on the party asserting the validity of the waiver, such as a release, to demonstrate that the waiver was "knowing and voluntary."  *See id.* at § 626(f)(3).

In line with its design, the OWBPA imposes "strict, unqualified" statutory requirements upon employers that wish to enforce an employee's waiver of ADEA claims obtained by a

release.  *Oubre*, 522 U.S. at 427.  As the Supreme Court discussed in *Oubre*:

> The statutory command is clear: An employee "may not waive" an ADEA claim unless the waiver or release satisfies the OWBPA's requirements. The policy of the OWBPA is likewise clear from its title: It is designed to protect the rights and benefits of older workers. The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word. Congress imposed specific duties on employers who seek releases of certain claims created by statute. Congress delineated these duties with precision and without qualification: An employee "may not waive" an ADEA claim unless the employer complies with the statute. Courts cannot with ease presume ratification of that which Congress forbids.

522 U.S. at 426-27.  An employer must comply with all requirements of the OWBPA in order for an employee to effectively waive an ADEA claim.  *Id.*  Substantial compliance is not adequate.  *See, e.g., Blakeney v. Lomas Info. Sys., Inc.*, 65 F.3d 482, 485 (5th Cir. 1995), *cert. denied*, 516 U.S. 1158, 116 S.Ct. 1042, 134 L.Ed.2d 189 (1996).  A release either satisfies all of the OWBPA requirements, meaning the waiver may be considered "knowing and voluntary," or a release fails to meet the requirements and is voidable. *Id.*

Thus, to prevail on their motion for summary judgment, Defendants must demonstrate that there is no genuine issue of material fact as to whether the release in the Agreement complied with each of the section 626(f) requirements and as to whether the release was otherwise knowing and voluntary.  *See Am. Airlines, Inc. v. Cardoza-Rodriguez*, 133 F.3d 111, 117 (1st Cir. 1998) (*citing Griffin v. Kraft Gen. Foods, Inc.*, 62 F.3d 368, 371-72 (11th Cir. 1995)).

Plaintiff Fisk contends that the Agreement violated the strict construction requirements and contends that the release is invalid because the Agreement failed to comply with the general requirements of the OWBPA.  Specifically, Plaintiff Fisk contends that the Agreement didn't

meet the requirement of advising Plaintiff Fisk in writing to consult with an attorney before executing the agreement, that there is an issue of fact as to whether Plaintiff Fisk received the required disclosures under § 626(f)(1)(H), and that the Agreement didn't provide the information required under § 626(f)(1)(H).

### 1.      Section 626(f)(1)(E)

Defendants contend that the language in the agreement which provides that "by signing it, Fisk was acknowledging that he had had the 'opportunity for consideration and consultation with [his] attorney,'" was sufficient to meet the requirements of section 626(f)(1)(E).  [*See* Doc. # 45].  Defendnats further contend that the Agreement sufficiently advised Plaintiff Fisk because it "advised that, '[e]mployee may discuss this Agreement with his/her attorney . . . on a confidential basis to the extent necessary to interpret the Agreement."  [Doc. # 45, 15].  Defendants also contend that even if this language was not sufficient, that Plaintiff Fisk admitted to consulting with a workers' compensation attorney around the same time, and that this consultation was sufficient to satisfy the requirements of section 626(f)(1)(E).  [*Id.*]

I have reviewed the Agreement and find that it does not comply strictly with the OWBPA with respect to the fifth requirement because it does not advise Plaintiff Fisk to consult with an attorney before signing it.  Because I find, as a matter of law, that the Agreement does not comply strictly with the OWBPA, I deny Defendants' motion for summary judgment.

The OWBPA provides that a waiver is not valid unless the individual executing the release "is advised in writing to consult with an attorney prior to executing the agreement."  29 U.S.C. § 626(f)(1)(E) (emphasis added).  While the language in the Agreement might arguably

11

substantially comply with the statutory language, substantial compliance is inadequate. *Blakeney*, 65 F.3d at 485. The language does not advise Plaintiff Fisk to consult with an attorney prior to signing the Agreement, or even that he "should" or "ought to" consult with an attorney before signing the Agreement. Instead it provides in passive language and in past tense that Plaintiff Fisk had the "opportunity for consideration and consultation with attorney," and that Plaintiff Fisk "may discuss the Agreement with his[] attorney."

I read the statutory language as requiring the waiver to affirmatively advise the employee to consult with an attorney, or that the employee is affirmatively advised that he "should" or "ought" to consult with an attorney. *See Am. Airlines*, 133 F.3d at 118. This is so because the provisions of the OWBPA are precise, "strict, unqualified" requirements for employers imposed by Congress, and courts cannot relax requirements that Congress lawfully imposes. *Oubre*, 522 U.S. at 427. The word "advise" means "to give advice to," "caution," "warn," "recommend," or "inform." Merriam-Webster's Collegiate Dictionary 19 (11th ed. 2004); *see also Cole v. Gaming Entm't, LLC*, 199 F. Supp. 2d 208, 214 (D. Del. 2002). The language in the Agreement is passive and does not "advise" Plaintiff Fisk to do anything. Additionally, portions of it are in the past tense, and past directives are also insufficient. The language does not "give advice to," "caution," "warn," "recommend," or "inform" Plaintiff Fisk to consult with an attorney; it only makes Plaintiff Fisk aware of a right that he has, but does not "advise," him to take advantage of, act on, or take any action regarding that right. *Am. Airlines*, 133 F.3d at 118. An employee, such as Plaintiff Fisk, is not required to infer the right to consult an attorney from language such as "may" or "has had." *See Cole*, 199 F. Supp. 2d at 214. Additionally, Defendants argue that

the fact that Plaintiff Fisk saw a workers' compensation attorney satisfies this requirement. However, the language mandates strict compliance, which the Agreement did not satisfy.

As the Agreement fails to advise Plaintiff Fisk to consult with an attorney prior to signing it, as explicitly required by the statute, the release is invalid and cannot be enforced against Plaintiff Fisk.  Accordingly, Defendants are not entitled to summary judgment on Plaintiff Fisk's ADEA claim.

### 2.      Section 626(f)(1)(H)

The OWBPA requires that the employer provide the employee with detailed information concerning a group termination program.  *See* 29 U.S.C. § 626(f)(1)(H); *see also* S.Rep. No. 101-263, at 32-34 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1538-40 (discussing distinctions between waivers obtained as part of individual separation agreements and those obtained as part of a group termination program).  At issue here is whether Defendants provided Plaintiff Fisk with the adequate information required by section 626(f)(1)(H).

Plaintiff Fisk contends that his release is invalid because he did not receive, or does not recall whether receiving, the information required by section 626(f)(1)(H) at the time of his termination and receipt of the Agreement.  Instead, Plaintiff Fisk contends that he received it at a later time.  Alternatively, he contends that his recollection raises an issue of fact.

At Plaintiff Fisk's deposition, in response to being asked when he saw the age and job title information purportedly attached to the Agreement, he stated that he didn't "remember

getting [it] on the day we were fired.  It seemed to me like I got it later but I'm not sure."  [Doc.

# 45, ex. 1, 7].  In a separate Affidavit, Plaintiff Fisk also provided:

> 2.  As indicated in my deposition, and interrogatory response, to the best of my recollection I did not receive the list containing ages and positions with regard to Mountain Coal's reduction in force until after I signed the release.  In my deposition, I was not expressing a subjective belief regarding what occurred. Instead, I was explaining what occurred to the best of my memory, but also indicating my memory may not be perfect.

> 3.  As indicated in my deposition, I do not recall that my copy of the list of ages and positions contained the reduction in force criteria on page 1.  To the best of my recollection, it did not have the criteria on it.  The first time I recall receiving the criteria is during the EEOC process.  Plaintiff Fisk contends that these statements create an issue of fact as to whether Defendants provided the required information to satisfy section 626(f)(1)(H).

[Doc. # 52, ex. 3].

Defendants contend that Plaintiff Fisk's testimony does not create a triable issue of fact. They contend that Plaintiff Fisk's assertion does not refute supervisor Don Vickers' testimony that each employee was given an envelope containing both the Agreement and Exhibit A containing the required disclosures.  [*See* Doc. # 45, ex. 16, 3].  Defendants also contend that Plaintiff Fisk has failed to refute Defendants' Manager of Human Resources for West Elk Mine, Ed Langrand's testimony that he was responsible for distributing the Agreements, and confirming that Exhibit A with the requisite information was provided to all terminated employees in identical form with the Agreement. [*See* Doc. # 54, ex. 4].

Thus, here there are two possibilities: Plaintiff Fisk either received the requisite information the date he received the Agreement or at a later date.  I conclude that Defendants' support is proper.  Defendants presented sufficient evidence from which a reasonable jury could

14

find that Plaintiff Fisk received the requisite information on the date he received the Agreement. On the other hand, Plaintiff Fisk's allegations that he does not "remember" are not sufficient evidence from which a reasonable jury could find that he was not given the requisite information and are insufficient to raise a triable issue of fact. *See Hatfield v. Occidental Chem. Corp.*, 842 F.2d 1290, at * 4 (4th Cir. 1988) ("A party opposing a [] motion for judgment cannot create a genuine factual dispute simply by claiming that he does not recall a particular fact upon which the moving party has presented affirmative evidence.") (*citing Carter v. Newsday, Inc.*, 528 F. Supp. 1187, 1191 (E.D.N.Y. 1981)); *see generally* 6 J. Moore, W. Taggart and J. Wicker, Moore's Federal Practice § 56.15[3] n. 39, at 56-484-85.  On this record, I cannot conclude that there was a genuine issue as to when Plaintiff Fisk received the required section 626(f)(1)(H) information.

Plaintiff Fisk also contends that the description of the eligibility factors and the decisional unit are insufficient.  He contends that Defendants' description of the eligibility factors is insufficient and that the disclosures failed to identify the decisional unit Defendants used for the reduction-in-force.

The OWBPA requires a more detailed informational disclosure when a waiver is sought "in connection with an exit incentive or other employment termination program offered to a group or class of employees." § 626(f)(1)(H).  In those cases the employer must:

> inform[ ] the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to-
>
>> (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

> (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(H).  The regulations implementing the OWBPA address the required disclosure for group employment termination programs.  The scope of the terms "job classification" and "organizational unit" in the statute are determined by examining the employer's "decisional unit."  29 C.F.R. § 625.22(f)(iii)(C).  The purpose of this provision is "to ensure that older employees are provided with information necessary to evaluate any potential ADEA claims they may have before deciding to release them."  *Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1247 (11th Cir. 2006).  In evaluating whether the employer's section 626(f)(1)(H) disclosure was sufficient, then, the relevant question is whether the employees were "provided with the age and job-title information that would be relevant if the employees were to bring an age discrimination claim arising out of their termination."  *Adams v. Moore Bus. Forms, Inc.*, 224 F.3d 324, 329 (4th Cir. 2000).  To achieve this goal, the OWBPA first requires the employer to inform the employees as to "any class, unit, or group of individuals covered by such program."  *See* § 626(f)(1)(H)(i).

The regulations refer to the "class, unit or group" in which the terminations are made as the "decisional unit":

> When identifying the scope of the "class, unit, or group," and "job classification or organizational unit," an employer should consider its organizational structure and decision-making process. A "decisional unit" is that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver. The term "decisional unit" has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program.

29 C.F.R. § 1625.22(f)(3)(i)(B).  The terms "class, unit, or group" depict abstract concepts that are used to organize individual members of a workforce. The makeup of the decisional unit may vary widely depending upon the purpose of the classifier.  Thus, the term "decisional unit" captures the flexibility and indeterminate character of the concept.  The plain language of the regulations indicate that the decision of who decides what constitutes a relevant job title, classification, or organizational unit belongs to the employer.  *See* 29 C.F.R. § 1625.22(f)(3)(ii)(D) ("If an employer seeks to terminate employees by exclusively considering a particular portion or subgroup of its operations at a specific facility, then that subgroup or portion of the work force at the facility will be considered the decisional unit.")  At its core, a "decisional unit" should "reflect the process by which an employer chose certain employees for a [reduction in force] program and ruled out others from that program."  29 C.F.R. § 1625.22(f)(3)(i)(B).  Assuming that the employer's identification of class, unit or group of employees from which the employees selected for separation were chosen reasonably describes an existing organizational unit within the company, the employer's designation should stand.  *Id.*

The decisional unit need not include an entire department or division within the organization. The regulations provide "if an employer seeks to terminate employees by exclusively considering a particular portion or subgroup of its operations at a specific facility, then that subgroup or portion of the workforce at that facility will be considered the decisional unit." 29 C.F.R. § 1625 .22(f)(3)(ii)(D).  Thus, if the employer decides to reduce the number of employees in a department working in a particular area, the entire department would not be the decisional unit. But the employer must make clear in its disclosure what portion of the department was considered.  It is not enough to say "certain positions" within a grouping were

considered without informing the affected employee in a manner he is likely to understand what positions within the department were considered. Otherwise, the employer would be free to disguise statistical evidence suggesting discriminatory intent by selectively excluding positions within a given organizational unit currently held by younger employees.

Moreover, when the decisional unit is less than the entire department or organizational unit, the criteria used to narrow the unit, the so-called "eligibility factors," must be reasonably objective. Otherwise, the entire department will be considered the decisional unit. Here, too, the regulations provide an illustrative example:

> If the terminees are selected from a subset of a decisional unit, the employer must still disclose information for the entire population of the decisional unit. For example, if the employer decides that a 10% RIF in the Accounting Department will come from the accountants whose performance is in the bottom one-third of the Division, the employer still must disclose information for all employees in the Accounting Department, even those who are the highest rated.

29 C.F.R. § 1625.22(f)(4)(v). While perhaps not as explicit as it could be, this regulation still clarifies an important principle in outlining the limits on an employer's ability to define a decisional unit. The regulations define, in their example, the acceptable decisional unit as the "Accounting Department." An employer may not, by the logic of this example, define a decisional unit as "the bottom one-third of the Accounting Department." In other words, the employer has discretion to choose its own relevant objective criteria in creating the decisional unit. The regulations do not take issue with whether the employer defines the relevant decisional unit as the "Accounting Department" or the broader "Finance Department" or even the narrower "Tax Accounting Department." Geography, education level, job title, seniority, current job

focus– all of these types of objective criteria are permissible bases for an employer's determination of a decisional unit.

On the other hand, flexible, manipulable, subjective criteria– even criteria couched in purportedly quantified terms, such as "performance" rankings– are impermissible means of creating a decisional unit.  Given the concerns regarding an employer's incentive to manipulate statistics and the relevant decisional pool, the regulations understandably prohibit an employer from arguing, tautologically, that its "decisional unit" is simply "the employees it decided were eligible."  The necessity of a prohibition on subjective criteria as the basis for a decisional unit is most evident in light of the OWBPA's other requirements and its purpose.  Most significantly, terminated employees must be adequately advised of the group of employees considered for termination, in order to determine whether discrimination existed. Thus, in order for a terminated employee to assess, meaningfully, whether or not discrimination played a role in his or her release, the employer must describe the relevant decisional unit in objective terms, consistent with the OWBPA and the regulations.  *See Kruchowski v. Weyerhaeuser Co.*, 446 F.3d 1090, 1094-95 (10th Cir. 2006) (holding that when the decisional unit identified in severance agreement differs from the actual decisional unit used, waiver is invalid).

In addition to informing employees selected for termination of the decisional unit that is the subject of the RIF, the employer must also inform the affected employee of "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program ."  29 U.S.C. § 626(f)(1)(H)(ii).  The employer must include the job titles and ages of all of the

employees within the decisional unit and indicate those who were retained and those whose employment was terminated.

Plaintiff Fisk contends that the decisional unit and eligibility factors provided in Defendants disclosure are insufficient to satisfy the statutory requirements. With regard to the decisional unit, I conclude that Defendants' provision that the relevant unit was the Production Group is sufficient to satisfy section 626(f)(1)(H). [*See* Doc. # 45, ex. 15, 2]. The Production Group, like the "Accounting Department" provided for in the regulations (*see* 29 C.F.R. § 1625.22(f)(4)(v), is an objective criteria that is a permissible bases for Defendants' determination of a decisional unit. It is not a subjective criteria based on flexible or manipulable terms. Further, basing a decision on a group, such as the Production Group, does not pose the risks the regulations are designed to prevent. As such, I conclude that with regards to the decisional unit, Defendants' disclosure was sufficient to satisfy the regulations.

Next I address the eligibility factors in Defendants' disclosure. Plaintiff Fisk contends that the description of the eligibility factors contained in the disclosure was insufficient to comply with the regulations. Section 626(f)(1)(H) requires employers to provide employees who are terminated as part of a termination program, such as a RIF, with information about the program. In particular, employers must supply the terminated employee with the criteria for eligibility for the program and with lists of the ages and positions of both, employees who were terminated through the program, and those who were retained. *Id.* § 626(f)(1)(H)(i, ii). An "employment termination program" takes place when a group or class of employees are involuntarily terminated and "offered additional consideration for their decision to sign a waiver." 29 C.F.R. § 1625.22(f)(1)(iii)(A). "Typically, an involuntary termination program is a

standardized formula or package of benefits that is available to two or more employees." *Id.* § 1625.22(f)(1)(iii)(B).

Here, the record shows that Defendants complied with both provisions. The disclosure clearly states its eligibility criteria including the following criteria: years of service at West Elk Mine, current miner rate of I, II, or II; skills assessment within current group (production maintenance, or surface groups); Certifications; behavior based safety standards; and current corrective action step. [*See* Doc. # 45, ex. 15, 2]. In addition, the disclosure included the required list which provided the job titles and ages of the employees terminated within the decisional units, as well as the job titles and ages of all retained employees within the decisional units. [*Id.*]  It is not disputed that Plaintiff Fisk was in the Production Group, i.e. the relevant decisional unit. *See* 29 C.F.R. § 1625.22(f)(3)(ii)(C).

Lastly, Plaintiff Fisk's contention that Defendants were required to provide the criteria for selection in the RIF program is incorrect. Instead, the OWBPA requires only the disclosure of the eligibility factors for a Severance Plan. *See id.* § 1625.22(f)(1)(iii)(A, B) (defining "program" as the package of benefits offered, not the involuntary termination program); *see also Recchia v. Kellogg Co.*, 951 F. Supp. 2d 676 (D. N.J. 2013); *Rupert v. PPG Indus., Inc.*, Nos. 07–0705, 08–0616, 2009 WL 596014, at *56–57 (W.D.Pa. Feb. 26, 2009) (following the EEOC regulations and finding that "program" refers to the benefits plan); *Ricciardi v. Elec. Data Sys. Corp.*, No. 03–5285, 2007 WL 576323, at *4 (E.D. Pa. Feb. 20, 2007) (holding that a release needed to include only the criteria for eligibility in the severance plan, not the criteria for termination). As such, I conclude that Defendants have met the requirements of section 626(f)(1)(H) of the OWBPA.

However, because I concluded that Defendants failed to show that all the strict statutory requirements of the OWBPA were met, summary judgment on Plaintiff Fisk's ADEA claims is denied.  *See Butcher v. Gerber Prods. Co.*, 8 F. Supp. 2d 307, 314 (S.D. N.Y. 1998) ("The absence of even one of the OWBPA's requirements invalidates a waiver.")  Furthermore, because the release is invalid, discussion of its validity under the totality of the circumstances approach is not warranted.

**B.      Whether Plaintiff Ratified his Release Under Colorado Law**

Defendants contend that Plaintiff Fisk's "state law discrimination claims must be dismissed because [Plaintiff] Fisk 'ratified' his release of these claims by retaining his $8,800 severance payment."  [Doc. # 45, 18].  Defendants contend that under Colorado's "tender back" doctrine, "Plaintiff [Fisk] must tender back the amount paid under an agreement before he may challenge it," and that by failing to do so he "ratified" the Agreement.  [Doc. # 54, 17].  Defendants rely on *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1228 (10th Cir. 1999) to support this contention.  However, Defendants argument is misplaced.  In *Bennett*, the claims at issue were state common law claims for wrongful discharge, outrageous conduct, negligent misrepresentation, and fraud.  189 F.3d at 1236-37.  In holding that these claims were barred by the agreements, the Tenth Circuit explained that under Colorado law, these claims were barred by the Plaintiffs' retention of their separation benefits.  *Id.*  By contrast, the claims at issue here are state statutory claims Plaintiff Fisk is asserting under the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et. seq*.  Thus, I must determine whether Colorado courts would apply Colorado's common law "tender back" doctrine to a claim of discrimination under the Colorado Anti-Discrimination Act.

22

Colorado courts have not specifically addressed whether Colorado's common law "tender back" doctrine would apply to a claim of discrimination under the Colorado Anti-Discrimination Act.  However, Colorado courts do look to federal cases for guidance in applying the Colorado Anti-Discrimination Act.  *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) ("we find federal law helpful in developing a thorough approach for proving intentional discrimination in state employment discrimination cases"; *see also St. Croix v. Univ. of Colo. Health Scis. Ctr.*, 166 P.3d 230, 236 (Colo. App. 2007).  Thus, turning to federal law, in *Oubre*, the Court considered the applicability of the tender back and ratification doctrines to the ADEA. *Oubre*, 522 U.S. at 422.  There, as here, the employer moved for summary judgment, contending that the employee had ratified a release of all claims against the employer by failing to return the monies she had received.  *Id*.  The Court held that the release signed by the plaintiff did not comply with the OWBPA's specific requirements regarding releases covering ADEA claims. *Id.*; *see also* 29 U.S.C. §§ 626(f)(1)(B), (F), (G).  The Supreme Court concluded that because it failed to comply with the OWBPA, the release should not bar the plaintiff's ADEA claim, even if the employee retained the monies she received in exchange for the release.  *Id*. at 842.

In so holding, the Court reasoned that enforcement of the tender back and ratification rules "would frustrate the statute's practical operation," and explained that:

> In many instances a discharged employee likely will have spent the monies received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the monies and relying on ratification. We ought not to open the door to an evasion of the statute by this device.

*Id.*  In line with Colorado courts' expressed desire and intention to look to federal cases for guidance in applying the Colorado Anti-Discrimination Act, I extend the Court's reasoning in *Oubre* to state statutory claims under Colorado's Anti-Discrimination Act and I find that enforcement of the "tender back" rule in the context of Colorado-Anti Discrimination Act would be improper.  Similar reasoning to that expressed in *Oubre* applies to employees bringing actions under the Colorado Anti-Discrimination Act.  Further, an inflexible application of the "tender back" rule would, as a practical matter, prevent courts from determining the conditions under which a release has been obtained.  Plaintiffs with meritorious suits effectively would be precluded from bringing their claims; this would be contrary to Congress' purposes in passing statutes such as the ADEA.

Additionally, as discussed above, the Tenth Circuit has also elected to apply the *Torrez* totality of circumstances approach to the determination of whether a waiver is valid.  As the Tenth Circuit explained:

> In our view, the totality of the circumstances approach is the better one. While evaluation of the language of the contract is necessary to determine the validity of the waiver of discrimination claims, our inquiry cannot end there. Especially "[i]n light of the strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the release, is also necessary."

*Torrez*, 908 F.2d at 690 (*quoting Coventry v. U.S.*, 856 F.2d 514, 522-23 (3d Cir. 1988)).  It would seem inconsistent to apply the contract principles of "tender back" or "ratification" to this case while embracing a "totality of circumstances" analysis to determine the validity of the release.  Thus, Defendants' motion for summary judgment is denied as to Plaintiff Fisk's state age and disability discrimination claims.

**IV.  CONCLUSION**

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' Motion for

Summary Judgment (Robert Fisk) **[Doc. # 45]** is DENIED.

Dated: May   16  , 2014 in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock

LEWIS T. BABCOCK, JUDGE