IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 12-cv-03341-LTB-MJW

EUGENE FOSTER, and
ROBERT FISK,

      Plaintiffs,

v.

MOUNTAIN COAL COMPANY, L.L.C.,
ARCH WESTERN RESOURCES, L.L.C., and
ARCH COAL, INC.,

      Defendants.

_____

## ORDER
_____

This matter comes before me on Defendants' Motion for Reconsideration or, in the Alternative Certification for Interlocutory Appeal (Doc. # 68).  Oral argument will not materially aid in the resolution of this motion.  For the reasons stated below, I grant Defendants' Motion. Because I grant Defendants' Motion and thereby grant Defendants' previous Motion for Summary Judgment (Robert Fisk) (Doc. # 45), I deny Defendants' Motion to Stay All Pre-Trial Deadlines as to Plaintiff Robert Fisk (Doc. # 72) as moot.

## I. **FACTS**

The facts and background of this case are set forth in detail in *Foster v. Mountain Coal Co., LLC*, No. 12-cv-03341-LTB-MJW, 2014 WL 2024877 (D. Colo. May 16, 2014), the order

from which Defendants seeks relief.  As such, I provide a limited factual background as relevant here.

Plaintiff Fisk has a high school education, has not taken any college courses, attended trade school for heating and air conditioning repair and maintenance ("HVAC"), but did not receive a degree or diploma.  [Doc. # 52, 4].  His work background is in construction and mining, and he has worked in mining for the past 20 years.  [*Id.* at 5].  He worked as an underground miner for Defendant Mountain Coal Company of Colorado, L.L.C. at the West Elk Mine from May 2001 through June 2009.  [*See* Doc. # 45, 2].

In June 2009, he and "approximately sixty other employees were laid off as part of a reduction-in-force ("RIF") at the mine."  [*Id.*]  Plaintiff Fisk purportedly learned of his layoff during a June 17, 2009 meeting, at which he and the other terminated employees were presented with a Severance Agreement and Release of All Claims (the "Agreement").  [*Id.*]  The Agreement released Defendants from "any and all claims arising from [Plaintiff] Fisk's employment in exchange for an $8,800 severance payment and other consideration."  [*Id.*]  Plaintiff Fisk signed the Agreement on July 5, 2009.  [*Id.*]  The relevant sections of the Agreement provide:

> 2.     Employee's employment will end effective June 17, 2009.  Within the time required by law, Employer will pay Employee an amount equal to Employee's accrued wages plus all earned and unused vacation, less applicable taxes, withholdings and standard deductions.  Within **45 days** after Employee signs this Agreement, Employer also will pay Employee severance pay in the amount of $8,800, less applicable taxes, withholdings and standard deductions as well as any prior pay advances.
>
> . . .

4.      Employee hereby releases Employer from all claims, demands or other rights to sue, whether they are known or unknown, foreseen or unforeseen, arising at any time before the date of this Agreement, including but not limited to those that arise from or relate to any aspect of Employee's employment with Employer, Employee's termination from employment or any employment custom, practice, policy, conduct or decision of Employer relating to any term or condition of Employee's employment, including but not limited to:

(1) any claims or rights that could be asserted under:

(a)      the Age Discrimination in Employment Act as amended, 29 U.S.C. § 621 et seq.  **In accordance with such law, employee is provided in Exhibit A: 1) a written list of the job titles and ages of all individuals eligible or selected for the same reduction in force; 2) an identification of the job classification or organizational unit targeted for that reduction in force; 3) the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the reduction in force; and 4) the factors used to determine who is subject to the reduction in force.**;

(b)      any applicable state law prohibiting or otherwise relating to employment discrimination, including but not limited to the Colorado civil rights laws and any statutory or common law giving rise to a cause of action for retaliation for filing a worker's compensation claim or otherwise engaging in protected conduct;

( c )    the common law of the state of Colorado;

. . .

(i)      the Americans with Disabilities Act, 42 U.S.C. § 12101

. . .

5.      Employee covenants and warrants that Employee will not sue or cause any complaint or lawsuit of any sort to be brought or join in or allow any complaint or lawsuit by any third party against Employer based in whole or in part on claims released in this Agreement.  Employee further agrees that, if any person or entity should bring such a complaint or law suit on Employee's behalf, Employee hereby waives and gives up any right to recover under such claim and will exercise every good faith effort to have that claim dismissed.  Despite the foregoing or anything to the contrary in this Agreement, Employee is not releasing Employee's right to file a Charge with or participate in an investigation

3

by the Equal Employment Opportunity Commission, the Department of Labor or other state or federal agency, subject to the legal requirements for doing so. However, Employee waives and gives up any right to damages that may be awarded on the basis of such Charge and also waives and gives up any subsequent right to sue based on such Charge.

6. **Because this agreement contains a release of claims under the Age Discrimination in Employment Act, Employee shall have 45 days from the day Employee receives it to consider it.  Employee may accept the offer contained in this agreement at any time within that 45-day period by signing it and delivering it to Employer.  If Employee does not accept this offer by signing this Agreement before the end of 45-day period, it shall be automatically revoked (meaning Employee will not have the right to a severance payment or to health coverage at active employee rates).  If Employee does accept the offer, Employee shall have seven (7) days after delivery of the signed agreement to Employer to revoke (i.e. cancel) Employee's acceptance.  The severance payment referenced above shall commence only after the seven (7) day revocation period expires, within the time limits previously indicated.**

. . .

10. Employee will keep, and cause his/her attorneys and agents to keep, the terms of this Severance Agreement and Release strictly confidential and will not directly or indirectly disclose the terms to anyone (either verbally or in writing) except (a) that Employee may discuss this Agreement with his/her attorney or accountant on a confidential basis to the extent necessary to prepare Employee's tax returns or interpret the Agreement; (b) to the extent that Employee is compelled by a court or governmental authority to reveal the Agreement, provided, however, that Employee will immediately advise Employer of this fact; or (c) in a suit to enforce or for breach of this Agreement, provided that the Agreement is kept under seal by the Court pursuant to a protective order.

. . .

16. Employee acknowledges that Employee has been given a reasonable period of time within which to consider the terms of this Severance Agreement and Release.

17. Employee acknowledges that Employee has carefully read this Agreement, understands all its terms, and has signed it voluntarily with full knowledge of its significance after opportunity for consideration and consultation with Employee's attorney, family and/or advisors before signing this Agreement. Employee represents that no payments or other things of value have been promised to Employee for signing and delivering this Agreement other than the payments, agreements and benefits described herein, which payments, benefits

4

and agreements constitute adequate payment for the claims herein released and Employee's other agreements outlined in this Agreement and that no attorney or counsel is entitled to any fees from Employer as a result of this Agreement.

Doc. # 45, ex. 2 (emphasis in original). In addition to severance payments, the Agreement states that Plaintiff Fisk would continue to receive health insurance for three months at employee rates. [*Id.*] Additional facts, related in the light most favorable to Plaintiff Fisk, the party against whom summary judgment is sought, will be provided as they relate to specific arguments and issues raised in the Parties' papers.

After limited discovery into the enforceability of Plaintiff Fisk's Severance Agreement's waiver provision, Defendants filed a motion for summary judgment. In denying Defendants' motion I held that Defendants failed to comply with the strict mandates of the OWBPA.

Defendants filed the present Motion for Reconsideration, or in the Alternative, Certification for Interlocutory Appeal (Doc. # 68), on May 30, 2014. Defendants subsequently filed a Motion to Stay All Pre-Trial Deadlines as to Plaintiff Robert Fisk (Doc. # 72) on June 26, 2014. Because I grant Defendants' motion for reconsideration and thereby dismiss all of Plaintiff Fisk's claims, I dismiss Defendants motion to stay as moot.

## II. <u>LEGAL STANDARD</u>

A district court has discretion to revise interlocutory orders prior to entry of final judgment. *See Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) ("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders."); *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."); *Wagoner v. Wagoner*, 938 F.2d 1120, 1122

n.1 (10th Cir. 1991) (noting that a motion for reconsideration filed prior to final judgment "was nothing more than an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.").  That discretion extends to rulings on summary judgment motions that resolve less than the entire case. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223-24 n.2 (10th Cir. 2008).

The district court's discretion to revise its interlocutory orders is not limited by the standards for reviewing a post-judgment motion filed pursuant to Rules 59(e) or 60(b) of the Federal Rules of Civil Procedure.  *See Raytheon Constructors Inc. v. ASARCO, Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003) (stating that "[t]he district court was incorrect to treat [the plaintiff's] motion for reconsideration [of an interlocutory order] under Rule 60(b), which only applies to final orders or judgments").  Instead, because judgment has yet to be entered, I may apply a less stringent standard than that applicable to a Rule 59(e) motion.  *See Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F. Supp. 2d 1250, 1256 (D. Colo. 2000).  However, "[n]otwithstanding the district court's broad discretion to alter its interlocutory orders, the motion to reconsider 'is not at the disposal of parties who want to rehash old arguments.'" *Id.* (*quoting Young v. Murphy*, 161 F.R.D. 61, 62 (N.D. Ill.1995)).  "Rather, as a practical matter, to succeed in a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision."  *Id*.  Even under this lower standard, "[a] motion to reconsider should be denied unless it clearly demonstrates manifest error of law or fact or presents newly discovered evidence."  *Id*

# III. <u>ANALYSIS</u>

Defendants argue that I should reconsider my previous order denying Defendants' motion for summary judgment because: (1) I erred in finding that the Agreement failed to comply with the statutory requirements of the Older Workers Benefits Protection Act ("OWBPA"); and (2) I failed apply the *Torrez* factors in relation to Plaintiff's Americans with Disabilities Act ("ADA") claims. [*See* Doc. # 70]. After thorough review and further research I agree that mistakes were made in the previous order and use this opportunity to correct those mistakes and dispose of all other matters pending before me.

## A.     <u>Whether the Release Complied with the Older Worker Benefits Protection Act</u>

In my previous order I denied summary judgment and held that the Agreement failed to comply with the statutory requirements of the OWBPA because it failed to comply with 29 U.S.C. § 626(f)(1)(E)'s requirement that the Agreement advise Plaintiff Fisk to consult with an attorney before executing the Agreement. Defendants contend that the language in the Agreement adequately advised Plaintiff Fisk to consult counsel, and that this requirement was satisfied where Plaintiff Fisk was actually "advised by an attorney in relation to his release." [*See* Doc. # 68, 2]. On reconsideration I agree.

The OWBPA, "is designed to protect the rights and benefits of older workers." *Oubre v. Entergy Ops., Inc.*, 522 U.S. 422, 427 (1998). "When a worker within the class protected by the age discrimination law (age 40 and up) leaves his employment, it is common for the employer to try to obtain a waiver of the worker's right to bring a suit under that law." *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 669 (7th Cir. 1998). In order for such a waiver to be valid, the OWBPA requires the employer to provide the employee with certain information so that he or

she can assess, with the assistance of counsel, the viability of such a discrimination claim.

*Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1259 (6th Cir. 1997).  Specifically, the OWBPA

provides that an individual may not waive a claim under the Age Discrimination in Employment

Act of 1967 ("ADEA") "unless the waiver is knowing and voluntary."  29 U.S.C. § 626(f)(1).

To be considered "knowing and voluntary," the waiver must comport with the following

minimal requirements:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)  (i) the individual is given a period of at least 21 days within which to consider the agreement; or
>
>   (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
>
>  (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;
>
> (H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to–

8

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).  The OWBPA also provides that "[n]o waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the [Equal Employment Opportunity] Commission." 29 U.S.C. § 626(f)(4).  Finally, the party asserting the validity of the waiver has the burden of proving that the waiver is knowing and voluntary as defined by the OWBPA in a court of competent jurisdiction.  29 U.S.C. § 626(f)(3).

I previously held, and here Plaintiff Fisk again argues, that the OWBPA is to be strictly construed and employers who request waivers of ADEA claims from their employees must strictly comply with its requirements.  [Doc. # 70].  In support of his argument for strict construction, Plaintiff Fisk points to my previous order citing *Oubre v. Energy Ops., Inc.*, 522 U.S. 422, 427 (1998):

> The statutory command is clear: An employee "may not waive" an ADEA claim unless the waiver or release satisfies the OWBPA's requirements.  The policy of the OWBPA is likewise clear from its title: It is designed to protect the rights and benefits of older workers.  The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word.  Congress imposed specific duties on employers who seek releases of certain claims created by statute.  Congress delineated these duties with precision and without qualification: An employee "may not waive" an ADEA claim unless the employer complies with the statute. Courts cannot with ease presume ratification of that which Congress forbids.

522 U.S. at 426-27.  In view of this language, Plaintiff Fisk contends that strict compliance with the OWBPA is required.  [*See* Doc. # 70, 3-5].

However, on reconsideration I hold that my previous order, and Plaintiff Fisk's argument for strict compliance as to all OWBPA factors, reads too much into *Oubre*.  In *Oubre* the issue before the Court was whether an employee was required to tender back to the employer the severance pay she received in return for a wholly nonconforming release as a precondition to filing an ADEA claim.  522 U.S. at 424.  Although general contract principles would support such a rule, the Court held that the language and purpose of the OWBPA override the common law.  *Id.* at 425-27.  The Court therefore concluded that the employee need not return the severance pay she received as a condition precedent to bringing suit.  *Id.* at 428 ("The statute governs the effect of the release on ADEA claims, and the employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply.").  Unlike this case, however, it was undisputed in *Oubre* that the defendant employer did not comply with the OWBPA.  The agreement in that case did not provide the employee the required time to consider her options, it did not allow her seven days after signing in which to change her mind, and it failed to specifically reference ADEA claims as among those she was waiving.  Thus, *Oubre* did not address the standard to be used by a court to determine whether an employer's attempted compliance meets the requirements of the OWBPA.

Here, Plaintiff Fisk contends that the Agreement fails to comply with the OWBPA.  Specifically, he contends that Defendants failed to meet two of the OWBPA's requirements: (1) § 626(f)(1)(E)'s requirement that Defendant advise Plaintiff Fisk in writing of his right to consult counsel prior to executing the Agreement; and (2) § 626(f)(1)(H)'s disclosure requirements,

which I concluded in my previous order that Defendants met, and is undisputed here.  Therefore, at issue is whether the Agreement met § 626(f)(1)(E)'s requirement that Defendants advise Plaintiff Fisk, in writing, of his right to consult counsel prior to executing the Agreement.

Plaintiff Fisk advocates for strict compliance and contends that the Agreement's advisement is not sufficient because it is in past tense and uses passive language.  Ultimately, Plaintiff Fisk's argument amounts to a distinction without a difference.  The Agreement is in writing and plainly indicates that Plaintiff Fisk was advised "to consult" with an attorney before signing the agreement.  *Cf. Am. Airlines, Inc v. Cardoza-Rodriguez*, 133 F.3d 111, 118 (1st Cir. 1998) ("because American failed to directly advise their employees to consult a lawyer before making the election, we rule, as a matter of law, that American failed to meet its burden under the OWBPA.").  Specifically, the language in the Agreement advised Plaintiff Fisk to consult counsel in two separate sections.  In paragraph 10, the Agreement provides that "Employee may discuss this Agreement with his/her attorney or accountant on a confidential basis to the extent necessary to prepare Employee's tax returns or interpret the Agreement."  [Doc. # 45, ex. 2]. The same paragraph also provides that "Employee will keep, and cause his/her attorneys and agents to keep, the terms of this Severance Agreement and Release strictly confidential."  [*Id.*] Paragraph 17 provides that "Employee acknowledges that Employee has carefully read this Agreement, understands all its terms, and has signed it voluntarily with full knowledge of its significance after opportunity for consideration and consultation with Employee's attorney, family and/or advisors before signing this Agreement."  [*Id.*]  Courts have found similar language to be in compliance with the OWBPA.  *See Jones v. Asset Acceptance, LLC*, 2008 WL 4080269, *3-4 (M.D. Fla. Aug. 28, 2008) (OWBPA complied with where employee "advised to

11

and . . . had the opportunity to consult with an attorney prior to executing"); *see also Moroni v. Penwest Pharmacueticals Co.*, 2009 WL 3335504, *8-9 (D. N.J. Oct 13, 2009) (language "you were advised to consult with an attorney about Agreement before signing it" complies with OWBPA). Moreover, Defendants gave Plaintiff Fisk the entire required time–45 days–to read and act on the attorney advice provisions contained in the Agreement.

I also note that the few courts that have addressed the issue of compliance have noted that the OWBPA is imprecise, and thus cannot possibly require strict application. *See, e.g., Raczak*, 103 F.3d at 1259. In *Raczak*, for example, the Sixth Circuit applied this reasoning to § 626(f)(1)(H) and reasoned that "the nomenclature of § 626(f)(1)(H) of Title 29 is ambiguous" so that "a rigid and mechanical interpretation of that provision is inappropriate." The court further explained that since clause (H)(ii) of § 626(f)(1) is imprecise, "[h]olding an employer strictly accountable for what might be a technical violation of these imprecise terms, with no indication that this would facilitate the provision's purpose and might even hamper it, is untenable and would elevate form over substance." *Id.* at 1260; *see also Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1246 (11th Cir. 2006) ("The only fair conclusion, then, is that the OWBPA is ambiguous."); *Manning v. N.Y. Univ.*, 2001 WL 963982, at *5 (S.D.N.Y. Aug. 22, 2001) ("strict interpretation does not require placing form entirely over function and we must evaluate the circumstances surrounding each waiver in light of Congress' objectives embodied in the OWBPA.").

I extend this reasoning here to hold that the Agreement did comply with § 626(f)(1)(E)'s mandate that Defendant advise Plaintiff Fisk in writing of his right to consult counsel prior to executing the Agreement. First, I note that the Agreement explicitly advised Plaintiff Fisk to

12

consult counsel in two separate sections of the Agreement.  [*See* Doc. # 45, ex. 2].  Second, I

note that Plaintiff Fisk concedes that he did in fact consult an attorney in relation to his

employment with Defendants.  [*See* Doc. # 52].  To hold that the Agreement failed to comply

with § 626(f)(1)(E) in light of these advisements and the fact that Plaintiff Fisk consulted with

counsel would require "placing form entirely over function."  *Manning*, 2001 WL 963982, at *5.

Additionally, the facts here are distinguishable from those in *Am. Airlines, Inc. v.

Cardoza-Rodriguez*, 133 F.3d 111 (1st Cir. 1998), which held that the agreement at issue failed

to comply with § 626(f)(1)(E)'s requirement where it only provided that the employee "had

reasonable and sufficient time and opportunity to consult with an independent legal

representative of my own choosing before signing this Complete Release of All Claims," on a

release that was not signed until the last day of work.  *Id.* at 114.  The Agreement and facts at

issue here are distinguishable for several reasons: (1) Plaintiff Fisk was provided the Agreement

beforehand and given the opportunity to take it home, review it, and sign it; (2) Plaintiff Fisk

was given adequate time under the OWBPA to consider and rescind the Agreement before and

after it was signed; (3) the Agreement advised Plaintiff Fisk of his right to counsel in two

different sections of the Agreement; and (4) Plaintiff Fisk was advised by an attorney in relation

to his employment with Defendants.  This was sufficient to meet the mandates of the OWBPA.

Therefore, I conclude that Defendants complied with the OWBPA's requirements, and as

such there is no genuine issue of material fact regarding the attorney advisement language.

Because I conclude that the Agreement complied with the requirements of the OWBPA, I must

next analyze whether it was "knowing and voluntary" under the totality of the circumstances test

enumerated in *Torrez v. Public Serv. Co. of N.M., Inc*., 908 F.2d 687, 689 (10th Cir. 1990).

13

**B.**     <u>**Whether the Release was Knowing and Voluntary under the Totality of the Circumstances**</u>

Since I find that the Agreement met the requirements of the OWBPA, I next analyze

Plaintiff Fisk's ADEA claim to determine whether Plaintiff Fisk's waiver in the Agreement was

"knowing and voluntary" under the totality of the circumstances.  As Defendants properly note

in their motion for reconsideration, this is also the proper analysis for determining whether

Plaintiff Fisk waived his ADA claims.  As such, I analyze whether Plaintiff Fisk's waiver of both

his ADA and ADEA claims were "knowing and voluntary" under the totality of the

circumstances.

In *Torrez*, the Tenth Circuit adopted the totality of the circumstances test for determining

whether a waiver is valid. 908 F.2d at 690  The totality of the circumstances test requires

consideration of the following circumstances and conditions under which the release was signed:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education
> and business experience; (3) the amount of time plaintiff had for deliberation
> about the release before signing it; (4) whether [p]laintiff knew or should have
> known his rights upon execution of the release; (5) whether plaintiff was
> encouraged to seek, or in fact received benefit of counsel; (6) whether there was
> an opportunity for negotiation of the terms of the Agreement; and (7) whether the
> consideration given in exchange for the waiver and accepted by the employee
> exceeds the benefits to which the employee was already entitled by contract or
> law.

*Id.* at 689-90 (*quoting Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988)); *see also*

*Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1228–29 (10th Cir. 1999).  An eighth factor, not

specifically articulated in *Torrez* but clearly considered by the Tenth Circuit, is whether the

employer exerted undue economic pressure on the plaintiff.  *See Torrez*, 908 F.2d at 690 & n. 3.

The question of whether such a waiver is knowing and voluntary is a question of fact.  *Id.* at 690.

14

Plaintiff Fisk, contends that the release was not knowing and voluntary because there are issues of fact as to five of the seven *Torrez* factors, as well as that his waiver was signed under economic duress.  [*See* Doc. # 52].  Plaintiff Fisk does not contest that factors (3) and (7) support Defendants' position that Plaintiff Fisk's waiver was knowing and voluntary– Plaintiff Fisk was given 45 days to consider the Agreement and Plaintiff Fisk received adequate consideration for signing the agreement.  The remaining factors are discussed in turn below.

**1.      Clarity and Specificity of the Release Language**

Plaintiff first contends that the Agreement's release language "was unclear with respect to its consequences."  [*Id.* at 22].  Plaintiff contends that the Agreement was unclear "as to whether [Plaintiff] Fisk would be eligible for continuation of health insurance under [Congressional Omnibus Budget Reconciliation Act ("COBRA")] without signing the release." [*Id.*]  However, Defendants disagree and contend interpretation of this language is not relevant when determining whether the language of the release was clear and unambiguous.  [*See* Doc. # 54, 2].  I agree.

First, as *Torrez* makes clear, the proper determination is based upon "the clarity and specificity of the release language."  *Torrez*, 908 F.2d at 689.  Thus, examining the insurance provisions of the Agreement is not necessary or proper to determine whether the release of claims was clear and unambiguous.  Second, to the extent that Plaintiff Fisk contends the release of claims was not clear and unambiguous, I conclude the release was clear and unambiguous. The language in the Agreement mentions the ADA, ADEA, and Colorado's statutory equivalent,

15

and thus is more specific than the language at issue in *Torrez*, 908 F.2d at 690.

Based on the clear import of this clause, I find that no reasonable juror could conclude that the rights waived by the Agreement were unclear or ambiguous.  Thus, this factor weighs in favor of Defendants and summary judgment.  *Torrez*, 908 F.2d at 690 ("[w]hile evaluation of the language of the contract is necessary to determine the validity of the waiver of discrimination claims, our inquiry cannot end there").

### 2. Plaintiff's Education and Business Experience

Plaintiff Fisk argues that the waiver was not knowing and voluntary because he had "little education and no applicable business experience," including having "only a high school education with no college courses."  [Doc. # 52, 23].  Defendants contend that although Plaintiff Fisk only has a high school education, he has a "notable degree of sophistication regarding discrimination and retaliation claims in the employment context."  [Doc. # 45, 7 (citations omitted)].  Specifically, Defendants contend that Plaintiff Fisk "testified in court probably half a dozen times, [] he filed a detailed response to Defendants position statement before the EEOC, . . . [and w]hile employed by Defendants, he filed multiple complaints with the Mine Safety and Health Administration ("MSHA") alleging Defendants had retaliated against him for reporting alleged workplace safety issues, . . . he had written to the Secretary of Labor in relation to [workplace] complaints[, and] . . . he had challenged the discipline imposed by [Defendants] on the basis of alleged protected activity."  [Doc. # 45, 6-7].

It is undisputed that Plaintiff Fisk only has a high school education.  However, Plaintiff Fisk was a miner for "over 20 years," eight of which he worked for Defendants.  [Doc. # 52, 23].

16

Usually, when courts discuss whether an individual has "business experience," they refer to the

length of time a person has spent in a particular industry and whether, based on his or her

employment duties, that person understood the scope of the bargain.  *See, e.g., Rutledge v. Int'l*

*Bus. Mach. Corp.*, 972 F.2d 357, 1992 WL 189105, at *2 (10th Cir. 1992) ("[p]laintiff had

twenty-five years of employment experience with Defendant and some post-high school

education"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 (9th Cir. 2007) ("[b]ased on her college-

level education and prior work experience with the Tempe PD, Nilsson possessed sufficient

education and experience to understand the waiver"); *Bittner v. Blackhawk Brewery & Casino,*

*LLC*, No. 03–cv–02274–MSK–PAC, 2005 WL 1924499, at *3 (D.Colo. Aug. 9, 2005) ("because

the Plaintiff held a management position, the Court assumes she had received training or was at

least aware of the existence of anti-discrimination laws").   Plaintiff Fisk's 20 years as a miner is

sufficient.

Plaintiff Fisk also attended Emily Griffith Trade School for HVAC training from 1986-

1988.  [*See* Doc. # 45, ex. 5].  Moreover, the fact that Plaintiff Fisk had made reports regarding

work place safety to the MSHA, disputed workplace discipline imposed by Defendants, filed

responses to the EEOC and written to the secretary of labor is sufficient to show that Plaintiff

Fisk had sufficient experience to be able to understand the agreement and was aware of his

employment rights.  He purported to have testified in court several times, communicated with the

EEOC on several occasions, filed multiple complaints of alleged retaliation against Defendants

with the MSHA, and challenged disciplinary action by Defendants on several occasions.  Based

on Plaintiff Fisk's education and experience, I find that no question of fact exists as to about his

ability to understand the scope of his rights under the waiver, and the legal implications of

waiving such rights.  *See Torrez*, 908 F.2d at 690.  Thus, this factor weighs in favor of Defendants and summary judgment.

### 3.      Whether Plaintiff Fisk Knew or Should Have Known His Rights Upon Execution of the Release

With regard to whether Plaintiff Fisk knew or should have known of his rights upon execution of the release, he obviously knew that he had a right not to be discriminated against based on age and disability, based upon the fact that that he had filed age and disability discrimination claims with the EEOC on July 10, 2009, five days after signing the Agreement. [*See* Doc. # 54, ex. 3]; *see also Rutledge*, 1992 WL 1891095, at * 2 ("Plaintiff knew of his right not to be discriminated against on the basis of sex, age, or race, as evidenced by his filing of discrimination charges within days of receiving his severance pay.").  Thus, this factor weighs in favor of Defendants and summary judgment.

### 4.      Whether Plaintiff was Encouraged to Seek Counsel

Because I conclude above that Plaintiff Fisk was adequately encouraged by Defendants to seek counsel, I find that this factor weights in favor of Defendants and summary judgment.

### 5.      Whether There was an Opportunity for Negotiation of the Terms of the Agreement

Plaintiff Fisk contends that he thought the agreement was not negotiable.  Defendants contend that Plaintiff Fisk never tried to negotiate the terms of the agreement because he knew he was "giving up potentially valuable legal rights in exchange for consideration," and that his consultation with a worker's compensation attorney demonstrates that he had "actual or constructive knowledge of his right" to negotiate.  [Doc. # 45, 9-10].

Plaintiff Fisk, as discussed above, was well versed in employment disputes and had sufficient experience to be able to understand the Agreement. *Anderson v. Lifeco Servs. Corp.*, 881 F.Supp. 1500, 1504 (D. Colo.1995) ("the Torrez factors tend to require a subjective analysis of the employee's understanding of the consequences of the release and whether the terms of the release were subject to negotiation"). Plaintiff Fisk waited to sign the agreement and after signing it filed age and disability discrimination claims with the EEOC. Thus, this factor weighs in favor of Defendants and summary judgment.

### 6.     Whether the Employer Exerted Undue Economic Pressure on Plaintiff

Finally, although not one of the seven factors listed in *Torrez*, Plaintiff Fisk maintains that another circumstance to consider is that he had no choice in signing the Agreement because he was under economic pressure. [Doc. # 52] Without signing the Agreement, Plaintiff Fisk alleges that he feared losing health insurance benefits. [*Id.*]

I find no merit to this argument. "[E]conomic pressure alone is insufficient to establish a claim of duress that would void an otherwise valid release." *Cirillo*, 862 F.2d at 452 n.2. Plaintiff has failed to establish a wrongful act precluding him from exercising free will. *See id.*

Thus, all factors of the *Torrez* totality of the circumstances test favor a determination that Plaintiff Fisk knowingly and voluntarily executed the Agreement. Based on this evidence, Defendants adequately demonstrate that, as a matter of law, Plaintiff Fisk knowingly and voluntarily waived his rights under the ADA and ADEA. Because there are no remaining genuine questions of fact with regard to whether Plaintiff Fisk's waiver was knowing and voluntary, I find that Defendants are entitled to summary judgment on these claims.

C.      **Whether Plaintiff Ratified his Release Under Colorado Law**

Plaintiff Fisk's remaining claim at issue is whether Plaintiff Fisk ratified his release under Colorado law.  However, since the I grant summary judgment on Plaintiff Fisk's ADEA and ADA claims, I decline to exercise jurisdiction over Plaintiff Fisk's supplemental state law claims.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that if the federal claims supporting supplemental jurisdiction are dismissed prior to trial, the state claims should be dismissed as well); 28 U.S.C. § 1367(c).

## IV.  CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' Motion for Reconsideration or, In the Alternative, Certification for Interlocutory Appeal **(Doc. # 68)** is GRANTED and I thereby GRANT Defendants' previous Motion for Summary Judgment (Robert Fisk) **(Doc. # 45)**.  Because I dismiss all claims against Defendants by Plaintiff Fisk I DENY Defendants' Motion to Stay All Pre-Trial Deadlines as to Plaintiff Robert Fisk **(Doc. # 72)** as moot.  Judgement for Defendants, and against Plaintiff Fisk, shall enter with costs awarded to Defendants.

Dated: July __30__, 2014 in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

20